The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. Our first case this morning is NEXTEC APPLICATIONS v. BROOKWOOD. We'll hear this case and then we'll take a short recess to reconstitute the panel. May it please the court, you all have read the briefs and you know some of the story, so I will not recount that here. I want to touch for ten seconds two factual predicates though that frame the legal issues here. First, NEXTEC is the innovator here. It has over twenty patents directed specifically to advanced waterproof breathable fabrics that are at issue here. The government contracts that are at issue are worth over a billion dollars, so this is a bet the company case. Brookwood, number two, Brookwood is a much, much larger competitor. It had been excluded from an earlier contract for Gore-Tex and here it acquired the NEXTEC fabrics and set about on a series of 150 trials over a year to replicate the products and the processes. We, NEXTEC, ask for two things today. One, that you vacate the finding of non-infringement with respect to the 902 and 841 patents, which this court will review for clear error. Two, that we ask that you vacate the claim construction with respect to the 172 patent and, as a result, return the case to the district court for further proceedings with respect to infringement. Because of the de novo standard that applies to the 172 patent, I'm going to start there. The parties devoted a full quarter of the briefing to the 172 patent. I'm sorry, Mr. Settey, could we actually reverse it and talk more about infringement in terms of what is your side's best evidence that there was infringement here of sheer thinning and why was the district court clearly erroneous in finding otherwise? Yes, Your Honor. The reason I had started with the 172 is there's no finding with respect to infringement on that one. That one was a summary judgment ruling simply because the expert had relied on the construction that the court didn't choose. So coming back to your question, Your Honor, you only need three things from this record to be able to understand both the technology and the results of the technology and to understand that what Nextech was able to show in terms of the accused products was not replicable either through what Brookwood had done before or with respect to any of the samples or SEMs that had been produced in this case. The SEMs are the scanning electron micrographs that are taken in cross-section of the actual fabric. They are the only hard evidence that exists in this case. If we were talking about a software case, we would be discussing the source code because this is a case where the actions are done at a microscopic level in the cross-section of fabric. The scanning electron micrographs are the key evidence. And here, the comparisons that we ask you to do are just two. But I looked at those pictures. They don't help us understand the process. And so the district judge, as I read through the record, struggled as well to determine whether the experts were adequately reflecting the process that gave us those pictures. Your Honor, I think you're right. The district court did grapple with that issue. If we talk about the process parameters, though, there is no question that the scanning electron micrographs that appear on page 20 of the blue brief, two sets, two different accused products with two different viscosities of polymer applied to them, there is no question that the process parameters applied to all of them was exactly the same. You'll see that the speed of the web on the machine was... Let me see if I can get your reaction to what the district court did in this case. After hearing the experts and still being somewhat conflicted on what process was producing these pictures, he said, well, if you can show me that you have been practicing this Ken Ryan process for a time predating the patent, then there can't be, in any event, infringement. And they were able to make that proof, and that decided the case. What was wrong with that? The approach, Your Honor, the approach that the district court, Judge Grise, specifically used there was that instead of proving whether the accused product satisfied the claim elements, he asked that we prove a completely different thing, which is whether there was a full development effort. So it took the entire infringement phase... But if they had been practicing this Ken Ryan method from well before the patent, isn't he correct that there either can be no infringement or there are validity issues? I agree that there would be validity issues, Your Honor, if it was proven that the exact same process parameters were used and the exact same chemicals. That is not what the evidence shows in this case, and it's not what the judge found. What he found was that there was no evidence of a full development effort. And I understand Your Honor's point that one can infer from that that he was looking to see whether sheer thinning occurred in the past or whether it occurred in the present. So he took the approach that said, if I saw a full development approach, it would have included, number one, chemistry, number two, the geometry of the machine, and number three, a so-called fully developed development effort. So the evidence of record shows that there were 150 trials done in order to be able to take the next tech fabrics that Brookwood had studied and then apply the exact same parameters. The record evidence, which is at 4177 of the appendix, is specifically that there were 60 separate trials done to tweak the chemistry. So that is exactly what he was looking for. And there were 90 separate trials done to play with the parameters of the machine, the speed of the web, the way in which the blade touches the fabric. That's a full development effort, and there's no real discussion of that in the only portion of the record where the judge's rationale appears. This is A4174-77. Those five pages tell us what the judge did. They're not the kind of findings you normally get after a bench trial on infringement. They are very high-level comments that go specifically to whether he saw the development effort. When I asked you to go to the micrographs, the reason is that if we look at the number of trials that Brookwood had done prior to this, if we look at their history, Your Honor just brought up one example of that, one fabric. But they had done tens of thousands of different runs, tens of thousands of different fabrics in the past. And what they've done in order to demonstrate that some of the ingredients had been used before is to point to a polymer from this particular day, in this particular year, and an additive from here, etc. It was a pick-and-choose process. It was not demonstrating that the exact same formulation was used in the prior time period. So that's not the case. And the hard evidence, the SEMs show us that. If you look at page 20 of the blue brief, there are two images on that page. They demonstrate the following. They demonstrate accused products that have a viscosity of X, 4,000 to 5,000 centipoise, and a viscosity of 4X, which is 20,000 centipoise. If we accept the premise that Brookwood would happily accept, which is that all of the penetration into the fabric was as a result of pressure, then if you apply the same amount of pressure to two fundamentally different viscosities of polymer material, then we would see evidence that they performed fundamentally differently in terms of how they were introduced or absorbed into the fabric. That would be if you had done it by solvents, as Brookwood claims. That would mean that one is thinner, one is heavier, and they would penetrate differently if it was merely pressure. That is not the evidence. If you compare those two micrographs, you'll see that they demonstrate all of the patented features. They demonstrate encapsulated fibers. They demonstrate open interstices. They demonstrate the kinds of things that are critical here for breathability and water permeability. The challenge for you, though, is that these two pictures, which are essentially nothing more than two dots on the fabric, is number one, you only have two dots of the fabric for us to look at. But number two, we don't really know how these fabrics got to look this way. I mean, there's a decent theory that shear thinning could have caused this, but it could have been other things. I guess what I'm wondering is, why is it, your side's view, that necessarily there's only one possible way on this planet to reach this particular outcome on these microscopic pictures? Let me address those questions in order, Your Honor. The first question was with respect to the dots. First of all, all of the scanning electron micrographs that Dr. Cole was able to do in this case were turned over. There is no question that all of those were turned over. So it's not, you know, the red brief takes the position that one could manipulate the micrographs or just give a portion of the fabric. Those issues don't exist, and there's record evidence to that effect at transcript page 1205, where Dr. Cole touches that. Now let's come back to the other issue, which is why it has to be the case that shear thinning occurred. If we start back at my premise, all of the process parameters are the same. That means the knife touches the fabric in the same way, whether you use viscosity 1 or viscosity 4 times 1. If the solution was to use solvents to thin those, then you would have to see a different penetration in these fabrics. That's not the case. The Cole testimony is that the only way that two radically different viscosities appear the same under SEM is by shear thinning. And that's discussed at page 21. But then we have Drs. Hauser, Pine, and Mr. Colasanto saying, no, it's the solvent. Your Honor, we have to pick each of those apart. I have in front of me Dr. Hauser's micrographs, which when he did his experiments, they show completely the opposite. But now you're asking us, see, to review facts. You're right, Your Honor. And the district court found those facts in a different way than we can credit you. Your Honor, it's a tough burden. It's a clear error burden, and I realize that. With respect to the 172 patent, we have none of those issues, because that's one where we're simply talking about claim construction on an issue that was never tried. The 172 is the one where the definition of thixotropic is at issue. And under this court's precedent, the definition of thixotropic could not be more clearly a own lexicographer definition. If you look at that patent, and this is discussed in the blue brief 45 to 48. But we can't read that back to the 051, can we? We can, Your Honor. How do we do that? Respectfully, Your Honor, you're confusing two different patents. I understand that. I'm not confusing them. I am asking you about them. The 172 patent has no comparison to the 051 in this record. That was not done on this record, because the issue there was non-infringement. The court granted summary judgment. The 051 support, with respect to invalidity, is compared then to the 902 and 841 patents. And there we have clear support. I'm happy to detail that. And seeing that my original time is up, if I may save my validity comments for rebuttal, Your Honor. Why don't you proceed a little further? Thank you. So, with respect to validity, Your Honor, on the 902 patent, there are just two issues. One is this notion of porosity. And the argument that Brookwood has made is that when one tries to control pore size, and we're talking about pores in the mesh or the web of the fabric. When you're trying to control pore size, you're managing, essentially, the amount of water vapor that can go through, and as well as certain pathogens. Could you focus a little more, instead of on porosity, on the material issue, and then also on the pump? Yes. Those are the two validity questions I'm interested in. On the material issue, which you just framed, the claim language is sheer, thinnable material. The support for that is a number of different excerpts from the 051 patent. First, Table 6 of the 051 patent, which is discussed in the yellow brief at 4445. The record site is A5337. There's a specific table there that lists a number of compositions that were contemplated all the way back to the 051. In that table, Rows 11 and 12 specifically list non-polymer colloids. The reason that they're non-polymer is that if you look right in the table at Row 11, it says it's 50 parts non-polymer, 5 parts polymer. The only record evidence on that issue is Dr. Cole, who testified that one skilled in the art would not see that as a polymer. There's one teaching of non-polymer. Second, in Claim 7 of that same patent, of the 051 patent, there are two additional compositions that are claimed, not just listed, but claimed, that are non-polymers. Those are a polyurethane and a polytetrafluoroethylene. Those are non-polymers as well, and those are also discussed in the record. What claims are those? Claim 7 of the 051, and then the other portion that I just read to you, Your Honor, is Table 6 at A5337. Those are two instances where materials that are not silicon-based polymers are specifically mentioned in the 051, disclosed as things that one could add for this coding purpose. And as a result, Your Honor, there is more than adequate support that it's not just a claim that's based on shear-thinnable material and that the only thing supporting it that's taught are specific polymers. There are non-polymers in at least two specific instances that are discussed in the 051. And if you remember, the district court on this issue said that he found that the testimony and the documents together to him indicated that there was adequate support there. When Brookwood touched the issue, they said that the judge had used the wrong legal standard, that he devolved everything down to the same basic invention being present. But when he was commenting specifically on the evidence, he said otherwise. He said, Dr. Cole – and this is, by the way, at Record A3999 – said Dr. Cole went through a complete rundown of the relevant language and tables in the 051 patent. So that's one of the rare instances where the district court actually added a specific annotation to the fact that the tables and the claim language together taught enough support. You asked, Your Honor, if I would touch the – Mr. Setti, we're going to have to move on at this point. We'll restore three minutes of your rebuttal time, and you'll give Mr. Joseph for an additional three minutes. That will keep things about even. Thank you. Thank you, and good morning, Your Honor. At the conclusion of the court's infringement portion of his opinion, the court said, quote, I think it's clear, but let me be completely clear. In my view, I've said Brookwood simply did not use surethinning, and if Brookwood did not use surethinning, they did not infringe. Because of that on-point fact-finding that a claim element was not satisfied, as the court's recognized, it's simply a factual question as to whether the district court's fact-finding is expressed fact-finding, is supported by evidence, or is clear error. And I don't plan to spend a lot of time belaboring these points because it sounds like – Can we move to validity for just a second? Absolutely. If there's a break in continuity, then the original applications are 102B prior art against printed publication prior art against the later patents. Under what theory, however, is there invalidity? I mean, how could it be that the earlier patents – We've got the prior art. What's the theory? Anticipation? Same inventor. You can't anticipate your own invention is not prior art against you. So you have to go obviousness, and there's no record. How do we get to invalidity here? I was going to say two things. First, normally after addressing the priority date, I mean, you would naturally remand for the district court to consider invalidity. How do we avoid that here is really what I'm asking. I was going to say the reason you don't have to hear is that they don't dispute it. I mean, there's no dispute on appeal. They've never disputed that if we have the earlier priority date, the invention is invalid. And so because it's not disputed before, that's why it's not an issue. If you're looking – and the other thing is, I mean, the reason that we mentioned that one earlier patent – But it has to comply with the law. What is the law? The argument – It's going to render this invalid. It can't be anticipation, so it's got to be obviousness. Where's the record? It certainly could be obviousness. Again, there's not a record on that before you because it's not disputed. So if you felt the need to vacate or remand for that – Was there a record before the district court? I don't see that either as the problem. The reason is that they didn't – I understand that you need a record, but when a point's not in dispute, you don't need a lot of a record. You have to at least put enough in the record to satisfy a – A burden proof. Yes. I understand that. And I'm sorry, because the question has just never been disputed, that's not something I'm especially up on right now. But the obviousness theory would be, and you're right, that if the earlier application – If we get to that issue, we've got to send that back to – for the development of a record on that. The other thing about – this is not in the briefs on invalidity. The reason that invalidity is really important, even if you affirm on non-infringement, is that there's already a follow-on suit that's been filed by NUXTEC and the Court of Federal Claims about – Which is precisely why I asked this question. Right. This has got to go back, doesn't it? Yeah. But I think that as a practical matter, though, if you affirm on non-infringement and vacate on any grounds on invalidity, I think there's a pretty good chance the district court would decide to dismiss our invalidity counterclaims in this case without prejudice, and then it could just be worked up in the other case. But in any event, if we want to cover on invalidity, I could pick up where Judge Chen was asking about where there's a disclosure in the 051 of anything other than a polymer composition. And the places to look really are the places that they pointed to, which is – first, they point to – sorry, I lost my tab. Yes. What they're relying on – and this is – it starts at appendix page 5336. They're relying on a table – the heading that this table then appears under is liquid silicone polymer preparation. So in other words, it says it's talking about liquid silicone polymers. What it then says is that these other solutions can be added to a silicone polymer as part of a liquid silicone polymer composition. So they're only talking about compositions that are silicone polymer compositions, not something that doesn't. The other thing he pointed to also then confirms that, because claim 7 that you referred to claims – and this is on page 5343, column 58, line about 11. It's a dependent claim that claims – a substrative claim 1 wherein said polymer composition is from a group consisting of – and then describes some things. What he read to you is some of the things that are described as things that the silicone – excuse me, the polymer composition could consist of. So everything they point to brings you right back to the fact that the only thing disclosed here for use is polymer compositions. Is the polyurethane a polymer? By itself, it may not be, but the point is that what they're disclosing is polymer compositions that could include these things. You can – pursuant to the table that we just discussed, you could include some of these things as part of a silicone polymer composition. It doesn't have to be 100% silicone polymer is the point. But it does have to be some silicone polymer as disclosed in the spec, and then even the language, albeit somewhat curious language of this claim, is fully consistent with what the spec says. Going back to the table though, examples 11 and 12, the judge took testimony, heard from your expert, heard from the other side's expert, and ultimately found that these examples, 11 and 12 in this table, were non-polymer. And that – now we're at a point where we have to determine whether that was clearly erroneous, right? Well, I would disagree with that first just because the district court, in contrast to the non-infringement portion of his opinion where he walked through evidence, this portion of his opinion, he said that there had been at least an, quote, implicit disclosure. And the only basis he gave for that was that, well, there had been changes over time, but it was the same basic invention from patent to patent. And that's just not the right legal standard. And for that very reason, he did not then go on to make the findings of fact that they're now relying on. He just didn't make a finding of fact that, in fact, the claim element was disclosed here, which is why – I mean, you know the reason, a minimum to vacate or amend for the district court to actually undertake the property. Well, he did say that all of the elements were either expressly or implicitly taught by this. And then he did take testimony about these two examples. And when you read through the transcript, you can see he's asking lots of questions and he's working his way through these issues. I agree he was highly engaged in all of this, but from the perspective of the same basic invention test is our point. And that's just not the right way to be looking at it. The application of the same – and the other thing is under this court's decision, for example, in Aniscape, an expert's testimony that's just contrary to what the patent actually says is not a basis for creating a fact question. Now, the other thing that is even somewhat more fundamental about the 902 and that shows why this test was wrong was that the 902 – what's different about the 902 and why it has a complete rewrite of the specification is that instead of talking about how to coat fabrics generally to impart various characteristics, it has this idea of controlling the sizes of the largest pores in order to exclude pathogen molecules. So the focus isn't on waterproofness as a whole. It's can you dictate the size of the largest pores so the molecules – pathogens of a certain size can't get through. And there's simply nothing about that in the earlier patents, including the 051. And to underscore that, what the 172 specification contains, for example, at Table 2 – Are we talking about the controlling pore size limitation? Yeah, controlling the size of the largest pores. That's what this is – that's what – that's the other issue on the 172. That's what the whole thing is about. And there's just important disclosures in the 172 about how to dictate the size of the largest pores. Not porosity general, but the largest pores. That's found, for example, in Tables 1 and 2 of the specification that explain how to adjust various variables in order to get a specific largest pore size and then which largest pore size you need to exclude a specific pathogen. Right, but we're now talking about something that's in the claim preamble, right? I mean, ultimately, if all of the limitations expressed in the body of the claim are in fact supported by the 051 patent, then that's really what we need to focus on, not the more goal-oriented statement expressed in the preamble. Well, I would agree with you that there is a claim construction question about whether the preamble is limiting. And the District Court did not reach that question, although it was presented to them before trial at Markman. You know, precisely because if you're looking at a more, you know, same basic invention test, you don't have to, you don't need to worry too much about the ins and outs of these things. But the reason that it's limiting, in our view, would be that first, a fair amount of the preamble, as you go into it, is clearly limiting because it talks about, if you're looking for the claim language, there's a handy chart the District Court put together on appendix pages 78 and 79 of all the asserted claims in the case. And for the, I'm sorry, we're talking about the 841 here. The preamble is a system for controlling the placement of a sheer, thin-molded polymer composition into a porous web, having a three-dimensional structure of a plurality of structural elements with interstitial spaces there between comprising. Most of that just has to be limiting. There's nothing prefatory about it. And in addition, the reason that the following claim elements, I mean, read frankly like about 100 other claims that they'd already gotten in various patents. You know, what's different about this, what helps them overcome a double-patenting objection, is the control. And so what you have, basically, they're saying is that, well, their argument is basically that, well, if you go back to the earlier patents, they disclosed the same basic machinery, the same basic process, and under the same basic invention test, that's good enough. But that's like saying the possession of an oven and a method of baking gives you possession of how to make a chocolate eclair or a lemon meringue pie, or the possession of a piano and a way of playing it gives you possession of any particular concerto. And that's why the basic same basic invention test is important and wrong. Now, on the 841 patent, which is the means plus function patent, I mean, it's a very narrow issue. There's no dispute that what's different about the 841 is that it's a means plus function language. And the structure that it gives for the means of applying the polymer to the fabric is described as a pump or a hose. So the question is just, if you go back to the 051, does it disclose a pump and a hose for the purpose of, for the function of applying polymer to the fabric? And the answer is no, because everything they point to in the 051, everything they point to in the 051, which is also found, again, in the 841. It's carried over. It talks expressly and specifically about a different function of removing excess polymer from the fabric later on in the process. We're talking about element 40 in Figure 6, right? Yes. 307. Figure 6 is absolutely the big one. And what you see in Figure 6, which appears in both patents, it's not new. It's a pumping mechanism, right? Yes, but the point is there are different functions spelled out, of course, in the claim. Different things are done here. If you start at the roller that says 10 on it, that's where the polymer is applied. So the polymer is applied at 10. Then you get to, you see 20 and 30, those are the knives that do the shear thinning. Then after that, you get this thing they say is a hose that runs down from the line and moves toward the number 41. That is described as a system for removing excess polymer. Elements 20 and 30 do the shear thinning? 20 does the shear thinning, and then 30 is also knives. And so the point is that there are a series of different steps here. And what you have here is you have applying the polymer, which has never been disclosed in the 051 as having anything to do with a pump or a hose. You later have shear thinning, and later on in the process, you have the removal. Now, we also know for sure those are different functions because, for a couple of reasons. First, the specifications expressly describe them in explaining that the removal, which is just inherently different from, I mean, applying and removal are just inherently different. But the specifications also expressly explain that, treat them as different steps, saying that the one is subsequent to the other. And there are also some, this removal step here, it's not even claimed in any of these, it's not recited in any of these asserted claims. In each patent, there's a small number of dependent claims that separately describe removal or recycling, which again confirms it's just a different function. And it's bedrock law, under means plus function law, that disclosing structure for one function isn't good enough for disclosing it for a different one. Which again is an indication of how this overall same basic invention test, you know, none of these legal niceties might matter to that. But they're really important because otherwise you end up with subsequent overbroad claims that get the benefit of the earlier priority date. And also at the time these were granted gave them a new patent term going forward. And that's why it's important not to just apply a generic same basic invention test. How do you get around the specific lexicographer definition of fixotropic? Sure, we say exactly what the district court did, which is that the patent contains a definition of fixotropy that is so high level in general that it just doesn't, it's not inconsistent with the ordinary meaning in this respect because it doesn't address this aspect of the ordinary meaning of the term. And you have other cases like Ecolab where the court said, yes, there's a specific definition here in the specification, but it just doesn't address this question. And that doesn't mean, therefore, that that aspect of the meaning doesn't exist. It means that as an Ecolab you apply ordinary principles of construction to it. It's especially clear here because the 051, excuse me, too many numbers jumping around here. This patent does specifically address the constant or steady point because starting at the beginning of column one of the specification, it expressly incorporates by reference, quote, in their entirety, a series of other patents and applications in the same family. And there's no dispute that two of them use fixotropic according to its ordinary meaning, including the steady or constant part. The 630 application is especially just dead on point about that. So because of the express incorporation by reference, it's as if those specifications are part of this one. So what they're asking you to do is to take a statement in that definition that's just too general to address this issue and say that it overrules, first, the part of this specification through the reference that actually does address the issue. Second, that it does so clearly that it can overcome the presumption that claim terms take their plain and ordinary meaning. Third, that it does so clearly that it can overcome even the stronger presumption that this court has erected, that within a family of patents, a single term, quote, must take the same meaning across them unless a contrary reading is compelled, which means there's no reasonable way to do it. And here there's easily a reasonable way to do it. What was your position again on regardless of taking either interpretation of fixotropic, you still win? Why is that? Well, I do think that if you disagree with this in the claim construction, you would remand. The reason we explain in the brief that we think it's a very easy remand, but I recognize I think you would remand, is that under any view, fixotropy is a type of application of sheer force. So whether it's sheer thinning or fixotropy, you're applying sheer force to, in the claims, reduce the viscosity of the polymer in order to cause it to enter into the family. And in terms of the district court's rationale and findings at the trial, it's the exact same thing either way. He said we use solvents and downward pressure from a sharp knife, not lateral pressure. So as a result, you may want, if you disagree with this claim construction, I can see you remanding for the court to connect the dots in that way. But it's a very easy connect the dots. Do you want to save any of your rebuttal on the cross appeal? Thank you, Your Honor. I'm done. Your Honor, I want to just make about four or five points directed specifically to the questions that were just asked. The first one relates to the figure six with respect to the 051 patent. The specific issue is whether a pipe is a hose. That's it. Because what's taught there specifically in column 33 of the 051 patent is a line path, which clearly shows pipes and a pump putting the material back in a reservoir. The argument that I just heard is that that's for a different purpose. The means at issue is for a means for applying, and it's applying the polymer. It is a recovery system rather than an application system. It's a closed loop, Your Honor. If you look at the figure, you'll see it's a closed loop. The recovery system is also the same system that's being used to introduce material to the reservoir. That's why I was about to turn to exactly that. That is a misleading application of the specification. It is characterized as a recycling. But your later patent has a second pump. That's right, Your Honor. And so maybe it's that second pump in the new patent that's actually doing the applying. Well, here, Your Honor, if we're looking for support in the same figure, figure six is in the later patent and the newer patent. Okay? So with respect to figure six specifically, the pump and the line path, which the undisputed testimony is that the line path to one skilled in the art would have been equivalent to a hose. It's a pipe. So just so that I cover the rest of the issues, Your Honor, with respect to your question, Judge Rader, about Thixotropic, it isn't the same result either way, meaning it's not the case that either construction leads to an automatic finding of non-infringement, which is what I just heard. It is instead the case that in the 172 patent, the language is different. The language is different in a material way. Rather than requiring sheer thinning, it requires that you have a sheer thinnable material. It is undisputed in this record at page A3308 that the material is sheer thinnable. Okay? Then when you get into the definition of Thixotropic, the reason that it's the right definition is that if you look at the record with respect to the 172, columns 14 through 18 are all specific quoted terms and definitions. It's under a heading that says definitions. They could not have more clearly – the heading, Your Honor, is at column 14, line 8. They couldn't have been more explicit in saying we wanted to define our own terms. The fact that in earlier applications they used other definitions doesn't change that, and this court's precedent should mean that that part is that we intended to and did convey a specific definition. We acted like our own lexicographer, and we ought to be able to get that issue vacated and remanded. And specifically, what are the extra words or elements that the district court imputed into Thixotropic that's giving you so much heartburn? It's not that they imputed it, Your Honor. This isn't an issue where we're trying to make it broader. We're trying to make it more specific, and that's the unusual case. It's because, Your Honor, it's this technical issue related to the way in which the case was disposed. It was not on the merits. It was simply that the expert had relied on one definition, which the court didn't agree with, so there was no expert report on the other definition. That's the only issue. So we still have a live case with respect to the 172 patent, if you all agree that the own lexicographer approach works. So it's not that we're taking things out. It's we want to put the right definition in so we can revisit the infringement issues, and the right definition adds the two structural components that you're asking about. It adds the encapsulated fibers, and it adds the internal layer, and it does them in the alternative. It does it with some alternative language, but that's the piece that's missing, and you couldn't more explicitly say quoted term definition. And that makes the 172 patent claim much closer to the other two patent claims because the other two patent claims are talking about encapsulating fibers and things like that. It does, Your Honor, but one important and material difference. Rather than a process step that is sheer thinning, here it's a sheer thinnable polymer composition, and the undisputed record is this is a set of two Brookwood sheer thinnable polymer compositions. So that's why I'm saying it's a live case, if you all agree that… And then subjecting it to some kind of sheer force, right? Yes, but there's no quantum that's required in the claim, Your Honor. It simply says that… The quantum is to reach the result of encapsulating the fibers. Which we've shown in the SEMs is the result that's being achieved. The difference here is if we look at the 902 and 841 claim elements, there's a more active requirement of sheer thinning, as opposed to the introduction of a material that is capable of being sheer thinned. Didn't your expert acknowledge that just by looking at an SEM image by itself, you can't really be sure what caused that result in the image? With due respect, Your Honor, to take that in context, the same expert said specifically that there was no way you could achieve the SEMs that are on page 20 without sheer thinning, because of the fact that we were taking two specific compositions with different masses, applying the same force, and seeing them act the same way. That absolutely required, and her testimony is unequivocal on this issue, that absolutely required that there be some sheering and some localized thinning, and that's the kind of textbook definition of sheer thinning. A force gets applied, the material thins, the force is removed, it sets in a certain way before it's cured. And that's what took place here. This is the undisputed... How about force, Mr. Setti? I'm sorry, Your Honor? A final thought, you're past your time. Final thought, Your Honor. If this was a source code case, you would be... If this was a software case, we'd be talking about the code. This is a chemical case, and the most one can do is demonstrate that all of the parameters are identical for both of these processes, which they are. And with different viscosities, the SEMs absolutely show that there was sheer thinning taking place with respect to that. Thank you, Your Honor. Thank you, Mr. Setti. Mr. Josepher, I didn't hear any argument on your cross-appeal. Understood, Your Honor. So I think we're done. Thank you very much, gentlemen. We're going to take a brief recess. All rise. The court is now in recess. Thank you.